All right, 13-1057, Gevas v. McLaughlin. Good morning, Mr. Vanko. Good morning. May it please the court. This case arises out of an inmate attack at Hill Correctional Center in Galesburg, Illinois in 2008. Just days before his cellmate stabbed him in the neck four times, David Gevas warned three separate prison officials at Hill Correctional that an attack was imminent. Mr. Gevas gave specific details of that attack. He identified who his putative assailant was, his cellmate, William Adkins. He identified the method of attack, a stabbing, and he provided prison officials with specific threatening comments that corroborated his fear for his life. Is the evidence sufficient to support a finding that Warden Wright was subjectively aware of a serious risk of harm to Mr. Gevas? For as I understand it, Mr. Gevas testified that he had a very hurried conversation with Mr. Wright as he was inspecting the prison kitchen. And what I would like you to tell us is why that very quick interaction would be enough to expose Mr. Wright to liability. And I can see that that is the weakest of the three. As to the three defendants, it actually was the assistant warden of operations at the time. Mr. Gevas was a cook, I believe, in the kitchen, so he was familiar with Warden Wright. And he did provide the same level of detail that he provided on multiple occasions, admittedly, to the other prison officials, one of whom was a counselor, one of whom was in internal affairs. So in terms of the details that he provided, I think he gave enough for Warden Wright to at least act or to at least delegate the responsibility to someone who was underneath him. But the details were identical, Judge Rogner, that he provided in both the letters and in the other oral statements to both Counselor Steele and Officer McLaughlin. But in candor, it was not as lengthy of a conversation. He didn't have the same type of involvement as he did the other two defendants. And so I would agree that of the three prison officials, that would be the weakest of the three cases. Would you agree, Mr. Vanko, though, it can be difficult and sometimes dangerous for an inmate to relay such information to prison staff? It can be, and it all depends on the context. And Mr. Gevas had a prior history with Officer McLaughlin, so he had talked to him in internal affairs office, for instance. He had visited him at the cell where they were housed together. With Warden Wright, it was in the kitchen and it was around other inmates. So I think the context of that conversation, yes, did it happen quickly? Was it informal? Yes, because it needed to be. I don't think it's the type of environment where you're going to be able to have a full conversation so that there could be a lengthy back and forth. But I would agree with Your Honor that depending on what the relationship is between the inmate and the specific prison official, that's going to flush out how those communications happen. So again, with respect to Warden Wright, that's all we really have. That's all the evidence produced at trial revealed as to the communications with him. But we do believe that it is sufficient to establish a question of fact that a reasonable jury could conclude, establish deliberate indifference on the part of Warden Wright. So we would ask that the court reverse and vacate the judgment that was entered on June 5th on Mr. Gevas' Section 1983 Eighth Amendment claims. That judgment was entered following an oral Rule 50 motion for judgment as a matter of law at the conclusion of the plaintiff's case in chief. And the reason is that a reasonable jury could have found that the defendants were deliberately indifferent to a substantial risk of serious injury. I would like to talk about the element of subjective knowledge. This case requires a relatively straightforward application of Farmer v. Brennan, which the court is very familiar with. The standard is both an objective and a subjective test that we need to show to allow a jury to conclude in our favor. And in terms of subjective knowledge, it's somewhat tricky to prove what's in the defendant's mind, because those are facts that are uniquely confined to their memories. But the case law allows us to prove subjective knowledge through circumstantial evidence. In an Eighth Amendment case, what the courts have instructed is the way to prove subjective knowledge is that an inmate must communicate a specific safety threat to a prison official, which then allows that prison official room to respond reasonably. That's what Farmer v. Brennan says. That's what the circuit authority here says. That's how you prove subjective knowledge. That's the paradigm. Now, there are other ways to do it. I will concede. You have a case like Farmer, for instance, which dealt with a different kind of set of facts, where the victim possessed characteristics that inevitably would lead to an attack. We don't necessarily have that here. So it's a different kind of circumstantial evidence that we are relying upon. But circumstantial evidence is often more persuasive and more powerful than direct evidence. We don't need an admission by the defendants that they knew something. We can prove it through indirect ways like we did here. The key takeaway, though, from these cases is that there's no rigid proof matrix that we have to follow to prove subjective knowledge. I'd like to take a different approach from my brief as to the subjective knowledge portion of the Farmer test. I'd like to focus on where failure to protect cases fail. When do they go bad for prisoners? And I'm going to give you six quick examples of when failure to protect cases don't get to a jury. Number one, the inmate won't identify the attacker. Number two, the inmate only expresses a general fear, does not relate a specific threat. Number three, the inmate won't give details of what the threat is when pressed by a prison official for details. Number four, the inmate has a history of lying to get a new cell assignment or even a transfer to another prison. Number five, the inmate has a history or, excuse me, the inmate has made inconsistent statements about the threat. And number six, the threat is old or is stale. Is what? Old or is stale. It's a threat that occurred long ago. Old and stale being synonymous. Synonymous. None of those benchmarks were present here. Mr. Jeevus did exactly what the case law instructs he must do to prove subjective knowledge, or at least to introduce enough facts that a reasonable jury could conclude that those prison officials had subjective knowledge of an actual safety threat. The defendants, I feel, if you read their briefs, raise an unjustifiably high barrier for how to prove subjective knowledge. Essentially what they say is this. Communicating the specific threat is not enough. You need to introduce collateral evidence unrelated to those statements. You need to come up with a plus factor, some collateral evidence that's disconnected from the statement that the prisoner gives to the prison official. And I feel that that introduces a bright line rule that's inconsistent with Farmer v. Brennan. Farmer takes a very specific fact-based approach and trusts that the juries are going to be able to decide how to interpret the evidence and how to assess the credibility of witnesses. I would draw an analogy if I could to employment discrimination cases. And if I could just pivot off the Eighth Amendment for a second. Consider a very common Title VII employment discrimination case where an employee introduces an affidavit that says, my supervisor made discriminatory comments that was tied to an employment termination or some adverse employment action. The supervisor introduces a counter affidavit that says the exact opposite. That's all there is that bears upon this question. Well, what we don't do is we don't say the district court judge can assess which of the two affidavits is more credible. What we say is let the jury sort out after a hearing. Who's the more credible witness? This case really is no different from what I just described. There is a fact question. During the discovery part of this case, the district court invited the three remaining defendants to submit a motion for summary judgment on the failure to protect claim, and they didn't do it. So the solution is not to drive a wedge in Farmer v. Brennan. What's the solution? Trust the jury. Instruct the jury on the law properly and trust that they can sort through witness credibility, that they can sort through the evidence and reach the right conclusion. I'd like to talk for a minute about responses. How does a prison official respond to a safety threat that he or she learns of from an inmate? Farmer v. Brennan is decently plain. What it says is that the inmate has got to put the prison official on notice of a safety threat, and at that point, the official needs to respond. He doesn't need to respond perfectly. He needs to respond reasonably. Minimal gestures or token gestures are not enough, but it needs to be a reasonable response. The response doesn't need to be intricate. It doesn't need to be complicated. It can be as simple as interviewing the prisoners separately, maybe even interviewing them together, talking to other inmates who are in adjacent cells to see whether there's a problem that's been festering. It could be sending a prisoner or an inmate to a psych ward for evaluation, if there's a mental health issue that's present. It could even be sending one of the prisoners or even both of the prisoners to administrative detention for a short period of time to sort through the investigation. And it could, of course, be a transfer to a different cell. The bottom line is there's options that are available to a prison official to formulate a reasonable response that doesn't pose a high burden on how those prison officials carry out their day-to-day job duties. Mr. Vanko, could you address what the evidence in this record tells us about the availability of administrative detention as a possibility in this situation and how it might have differed from punitive detention and segregation? I don't think as a practical matter it's all that different except it's nondisciplinary status. So if, for instance, Judge Hamilton, if Adkins was sent to administrative detention, it might be in a segregated housing unit, but that's not going to trigger any procedures before the adjustment committee to determine what punishment might be. Doesn't lose good time? No. What about time out of cell? I believe that it could impact their time out of cell, such as visitation rights, how much time they get in the yard. I don't know specifically if the Illinois Administrative Code identifies how much that would be. I think it can be no more restrictive than what disciplinary segregation would be, and I think that's all it says. If the court would like, I can supply a more detailed answer in a letter to be filed with the court, but I don't believe it's any more restrictive than that. I don't think it's necessary. Okay. In terms of the response here, let's be clear that there was none. What the defendants have said and what they have cited to you is a comment that took place in Officer McLaughlin's office two months before the Adkins attack, before Mr. Jeevus and Mr. Adkins were even celled together. And at that point in time, it's important to remember what happened. Mr. Jeevus had complained about being celled with someone who he felt was in a game. There was no safety threat. There was no specific threat to his life or to his safety at that time. So what he did is he told Officer McLaughlin he didn't like a cell assignment, but at that point in time, Officer McLaughlin was under no duty to respond under farmer because he didn't have enough to go on. So he told Jeevus, and whether it's right or wrong, what he told him was, you can refuse housing and go to segregation. Now, they're trying to use that comment in March to apply to the May incident in which there was a specific safety threat, and we don't feel that that's an appropriate response. It's simply punishment to avoid an attack. And, in fact, it inverts farmer because farmer talks about an affirmative duty to protect, not an option to ignore. And if you think about it, that would lead to chaos within the prison system. There's no incentive at that point. If that's a reasonable response, there's no incentive to investigate threats to inmate safety, and you literally would have a situation where the inmates are running the prison. It effectively is penological Darwinism is what that amounts to, and we do not feel there's any authority that that would allow the prison officials to respond in that fashion. I see that I'm into my rebuttal time. If there are any further questions, thank you. Thank you. Hello, Mr. Turner. May it please the court. I'm Christopher Turner, the Illinois Assistant Attorney General here on behalf of the defendants. This court should affirm the judgment in favor of the defendants on any of the three alternative grounds that we set forth in our brief. However, I'd like to first address the, well, it's really the second and third grounds together, the response that the defendants did not recklessly disregard any substantial risk to Plaintiff Jeevis. Before you do that, I'm going to ask you this, because it has really been on my mind a lot. What case has ever suggested that a prisoner must violate a prison rule and expose himself to discipline in order to avoid a threat to his safety? What that does is it transfers, well, it's a rationale that would transfer the burden from prison officials to the prisoner himself. Well, Your Honor, there is no case directly in point, actually, as we make clear in our qualified immunity argument. However, in the Ricardo case, I mean, there were certain principles that this court recognized, that the Eighth Amendment does not provide a veto power to prisoners over their cell assignment, and that the prisons do have to deal with the problem that prisoners will sometimes either lie or have unsupported fears to seek their assignment. Just try to seek either the cell or the cellmate of their choice. Now, the principle here is that the system allows a veto power to prisoners in order to escape from a cellmate. It gives them the ultimate veto power, but they do have to then be subject to potential discipline for it. Now, the discipline... I don't understand that, but go ahead. Well, because... The discipline is because... If they lie, if they lie about it, they're subject to discipline, right? Correct. If they don't believe that they did or they were, or if they don't believe that they were justified in the reasons that they did. Okay, so why is that comparable to the situation Judge Roedner has asked you about, where the theory seems to be that a prisoner is legally obliged to save himself by violating a rule and then getting segregated? Well, that still is consistent with the Eighth Amendment, Your Honor. The Eighth Amendment does put the onus on the prisoner in order to show deliberate indifference by the plaintiffs. They're the ones... They do still have to come forward and identify the substantial threat. You see, just now when you were speaking, I was thinking of Mr. Stern in the previous case who said, you know, you don't have to violate the law prospectively. And that's what you're asking Mr. Gevis to do here, it seems. We're requiring prisoners to risk a violation and discipline, but the discipline, even under his testimony that he faces, would not be significant of a constitutional measure. Is that a question of fact? Is that a question of fact? No, Your Honor, because we have here only Gevis' testimony, but Gevis admitted that he would be taken immediately to disciplinary segregation, and that when he described... The question wasn't that he acted reasonably, is that a question of fact or not? Prison officials. They gambled. They gambled? They did, didn't they?  They knew that he was saying he was threatened, and they took the action they did take, and he was eventually hurt, so that their decision to do nothing was either a gamble or they were goofy. As the facts we have to take at this procedural point, they had decided not to do anything and to rely on him to refuse housing. Back up a second. He said they relied on him to do something to refuse housing. It was two months earlier, that conversation with McLaughlin, in a different context, right? Well, it was a similar context. It was less than two months. It was seven weeks. Is your theory, though, that he should have remembered that conversation and assumed that McLaughlin would take the same approach? Yes, Your Honor, actually that is, and he doesn't deny that he remembered it. As a matter of law, on a Rule 50 motion? Yes, Your Honor, because of his testimony, we have to take the evidence as he put it forward. He doesn't claim that he didn't remember it. He doesn't claim that that was the reason he decided not to elect to refuse housing. Was he asked that question? Not that specific question, but he was asked that if he had done it, that he had been informed of it, that McLaughlin had informed him of the option, that if he had elected to do the option, he would have been immediately transferred to disciplinary segregation and away from his cellmate adjuncts. But you're asking him to allow himself to be punished in order to survive. Well, first, he's not a punishment of a constitutional magnitude. He would prefer to go to another cell assignment. The other option is for him to be ending up in segregation. The court has always recognized you can send people to segregation as a mode of protection. Do the Illinois prisons impose changes in good time classification as disciplinary measures? It's an available remedy, right? It's an available remedy. And that clearly has constitutional consequences, correct? That is, Your Honor, yes. You're entitled to due process, et cetera. Correct. That sounds pretty punitive to me. But there is no evidence that that was going to be a likely- He was supposed to figure that out? Well, he actually testified back in the transcript at pages 52, pages 55 to 56, that the first time of infraction for refusing housing is 30 days in segregation and the related loss of privileges. And there's a legal guarantee that he wouldn't be subjected to more severe sanctions for whatever he might have done to get segregation. You're asking a prisoner under serious and potential deadly threat to make extraordinarily fine judgments to save himself from what prison officials are supposed to take care of. Your Honor, it is what the officials, but the question here is, were they acting with deliberate interventions? Was their response akin to criminal recklessness? And the only evidence we've got is they were informed of the specific threat and did nothing. Correct? Well, for purposes of this argument, we also argue that there was not an information- that they were not, under even his allegations- That is not an argument you make to a jury and let them address it as a matter of absolute law. Which question, Your Honor? The question you said, we urged and so on. No, Your Honor. First, with the question of subjective awareness, I mean, we separately do defend the district court's decision that the specific information that he provided, the evidence, was not sufficient in order to find that each defendant was subjectively aware. As a matter of law. As a matter of law. Yes, Your Honor. Well, I mean, in terms of showing that the defendants were subjectively aware of a serious risk of harm to him, why wasn't it sufficient for him to testify about what he told the defendants? I mean, what the defendants did in response and what they concluded about the credibility of the threat is within their exclusive knowledge, isn't it? Well, but, Your Honor, it is his burden to provide sufficient evidence that a jury could find that they were subjectively aware. Therefore, they have to show a risk- He told them that they knew. He testified that each of them knew about the threat, who the threat was coming from, that it was imminent, what more is needed. Well, Your Honor, he did. He testified that the threat was from his cellmate Adkins, but he testified that what he told them was that the threat was the statement that Adkins had made to him that you're not too big to bleed. Right, and Adkins had also identified himself as a gang member. He accused Givas of snitching on his previous cellmate, who was also a gang member. He repeatedly, according to Givas, threatened to stab him. He did all of these things. He had not only reported the threats to three different prison officials, he'd sent follow-up letters to two of the officials, Steele and McLaughlin, reiterating his concerns about Adkins. And four days after he speaks to the third prison official, he's stabbed. So, gosh, I don't know what else a prisoner could do. Well, Your Honor, he did not tell- the only information he conveyed to each of the three of them, and there was one personal conversation with each defendant- And two letters. And two letters to two of the defendants, not to defendant Wright, was that he had been threatening him by saying that he was not too big to bleed. If you go back and look at each of the testimony that he gave, when he was asked by his counsel, for instance, at page 16 of the trial transcript, did you tell about Defendant Steele, the counselor, did you tell him about the threat? And he said, yes. I explained to him about the threat of being stabbed, not too big to bleed. The same thing with Wright, when his counsel asked him at page 33, and did you tell him about the threats? He said, yes. I told him he told me that I'm not too big to bleed. Even if you look at the letters, the letters that he alleges that he sent to the two defendants, Defendant McLaughlin and to Defendant Steele, he says, I am respectfully requesting your immediate help with getting moved from my cell because of threats that I'm not too big to bleed from my celly adkins. So let me try to repeat the question. What else do you think he had to do? Did he have to have the defendants, does he have to say the defendants said, I hear you and I understand? Or what else does he have to say? Well, no, he has to, if Adkins had not at that point conveyed enough of a threat that the defendants were required to conclude. Your position is that's not enough of a threat. Correct, Your Honor. It was not enough of a threat. The question is not whether a reasonable person might interpret that as a threat of a substantial risk that he would attack them. It's not even as the case, as Ricardo said, not whether he should have concluded that that statement means that he intends to attack them. It's whether it would be criminal recklessness, whether he did. It has to be so obvious that you can conclude that each defendant was subjectively aware. What could he have said that would be more obvious? And isn't it, as Judge Bauer noted, a question of fact for a jury? Well, Your Honor, it does depend on the surrounding circumstances. We don't seek here, contrary to what plaintiff's counsel says, we don't seek a categorical rule. We do agree that, as Dale V. Post in this course clarified, as the vagueness of the threat increases, then the knowledge, the actual knowledge of the impending risk decreases, but you have to look at the surrounding circumstances. So if you look at the cases that he cites, the unpublished case, Gidarsing, there the threat he conveyed was that the gangster disciples had come to him and said, we are going to beat you for killing our gang brothers. And, in fact, he had been convicted and just put in prison there for shooting two gangster disciples. In the Haley v. Gross case he relies on, there, the threats he actually, the assailant. Well, doesn't that equal out to what Givas was told by Atkins? You ratted out on your last cellmate, who was also a gang member, just like I am? No, Your Honor. Oh, no. Well, no, Your Honor, because in that one you actually had, it was a specific threat that they were going to beat him for killing the gang brothers, and there was the other information. You have to articulate the motive. The motive, but a motive that they would be required to believe, or at least that there was some reason to think they would believe. I mean, in fact, this case is, this court has said in Dale V. Post, that just being a snitch is not enough, and there was no facts he gave to make them believe he was a snitch. No, you have to have been threatened, right? But, Mr. Turner, let me just, before your time runs out, I do want to ask you about Mr. Wright. And although plaintiff acknowledged that, you know, there's not a letter and it was a quicker exchange, we are dealing with the standard of judgment as a matter of law, where we have to give the plaintiff the benefit of all the evidence and inferences from it. And if I understand this record correctly, Wright was informed of the same specific and serious threats. It was in a quicker or hurried context in this encounter in the kitchen, but I think all that, the same information was conveyed, and Wright's response on this record was also to do nothing. I'm troubled about how we could affirm that ruling under the Eighth Amendment, but maybe I've misunderstood the evidence about Mr. Wright. Well, Your Honor, he didn't actually testify. All he testified, other than the one specific answer to his counsel's question, he said, yes, I told him that he told me that I'm not too big to bleed. Other than that, all he testified was I told him what was going on. He didn't relay the specific information in the same way. I asked him for his help to move me out of that cell, being that it wasn't getting done, because he talked to McLaughlin and Steele, right? I'm looking at 33 of the transcript. He told me that I'm not too big to bleed. Quickly explained I'm trying everything I can to get out of the cell. I don't want to get stabbed. I'm in fear for my life. Did you ask him for assistance? Yes, I did. Did he respond to you? No. And there's no further response. Well, Your Honor, though, he didn't talk anything about, for instance, the context that you found important to the letter about Adkins calling him a snitch. He hasn't testified explaining any of that specific information to Defendant Wright. He's in the kitchen, surrounded by all the other inmates watching the conversation. The fact that he was frightened enough to be able to do that, doesn't that say something? It does, but Your Honor, it's not the Eighth Amendment. It does not mandate a best practices rule. In order to hold a defendant liable, you have to find, and not only they were negligent or grossly negligent, there was a criminal recklessness standard here. So it's not whether you think it would have been a better practice for Wright to have done something more. The question is, from the information that was provided with him, was he subjectively aware of that risk and required to respond in some way? Thank you. Thank you, Your Honor. You have a minute. You may take two. I won't take two minutes. Just quickly on the issue that Judge Hamilton, I believe you asked counsel, I think the important exchange for what Jivas anticipated would happen in segregation is what Judge McDade asked him at the conclusion of the question. If you look on pages, I think it's 56 to 58, or 56 to 59 of the trial transcript. I think that's where Judge McDade follows up on the questioning of counsel. I think it's important to focus in on that portion of the transcript. The final point I'll make on the comment that Adkins said to Jivas that supported the threat, this I'm not too big to bleed. Jivas is a big guy. He's not physically intimidating. He's just very overweight. And so the fact that it's an oblique comment as opposed to something more direct in the nature of I'm going to stab you on Tuesday at 5 p.m. I don't think is determinative. I think we need to look at the comment. The fact is that it's a strange comment. It's not something somebody would necessarily make up. So when you're repeating a comment like that, I think the person who receives the comment ought to interpret it in context and say, well, there might be something there because the comment is so unusual. Looking at Jivas' physical stature, it might make sense that it's credible. So unless the Court has any further questions of me, I'd like to thank the Court for its time. No, and we would like to thank you, Mr. Turner, because you were appointed by the Court. Oh, I'm sorry, Mr. Vanka. We're going to thank you in a minute, Mr. Turner. Thank you so very much for doing such a good job for your client and for being here today. And thank you, Mr. Turner, as well, always, the Attorney General's Office. Thank you very much for doing the job you do for your client. We really do appreciate having you all here. All right, the case will be taken under advisement, of course.